NS

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

| | |
|---|---|
| Joseph Valerio, | )) APPEAL NO : 22-6986 |
| (Appellant). | )) |
| | )) ( Civil Case No : 5:20-CV-185 ) |
| Vs. | )) |
| | )) |
| United States Of America, | )) |
| (Appellee). | )) |
| | )) |

PETITION FOR PANEL REHEARING

AND FOR

HEARING OR REHEARING EN BANC

(Fed. R. App. Proc. Rule 35(b)(1) and Rule 40 ).

## REQUIRED STATEMENT

1.    I, Joseph Valerio (Valerio henceforth), Plaintiff/Appellant in the action captioned above, appearing in pro se, and based upon my limited expertise and reasoned judgment, express a belief that, this appeal involves one or more question(s) of exceptional importance, including a justification for en banc treatment:

(a) The Panel's decision is contrary to the accepted maxims of interpreting the Federal Tort Claim's Second prong of Berkovitz inquiry i.e. the determination of whether the challenged conduct furthers a public policy that the regulatory regime seeks to accomplish.

(b) Two, the Panel's decision allows Bureau Of Prison's Discretionary Function to usurp any and all actions brought by prisoners under the Federal Tort Claims Act.

(c) Three, the Panel's decision stands in stark contrast with the Executive Branch's watchdog, the Office of Inspector General, that investigated a similarly situated, including the facility, and acts, where it concluded the officers to be 'negligent'' and ''performance failures'', ''bureaucratic incompetence'', and ''flawed policies'' incapable of meaning.

- 1 -

RECEIVED

2023 MAR 23  PM 2: 17

U.S. COURT OF APPEALS
FOURTH CIRCUIT

(d) Finally, the Panel's decision is a silent obituary to constitutional analysis of a policy that a regulatory agency intends to accomplish, a licence to violate constitutional rights of individuals the policy intends to affect, with impunity.

## SUMMARY OF THE PROCEEDINGS

2.  The Appellate Panel has summarily affirmed the district court's decision without substantive or otherwise meaningful arguments on the record, based on a pro se litigants informal brief.

## STATEMENT OF FACTS

3.  The Agents of BOP in either negligence, laziness, or dereliction of their duties, failed to assess Valerio's nature of offense which forbids him from being classified and designated to U.S. Penitentiary Hazelton's Maximum Security Prison, due to the impending assault.

(b) The intake staff at U.S.P. Hazelton, were negligent, or lazy, or derelict, in their duties prior to making a decision to house Valerio in General Population, knowing that the assault was imminent.

(c) Within hours of assigning Valerio to units general population, the agents in their orchestrated an assault on Valerio, by intentionally disclosing the nature of his offense to other inmates.

(d) As a result of that disclosure, Valerio was assaulted with deadly weapons by the inmates causing him serious bodily injuries, which resulted in him in undergoing numerous medical procedures and he continue to suffer those injuries.

(e) After the assault, the BOP agents engaged in a coverup, investigated in bad-faith to protect the agents involved in this conspiracy.

(f) The government alludes, the injury is not due to negligence, but the discretionary function, that precludes the Court's inquiry.

(g) However, the Office of Inspector General (OIG) which recently conducted an investigation into a similar case involving the homicide of James "Whitey" Bulger, found that the BOP's actions like in case at bar, were inherent errors "because of staff and management performance failures; bureaucratic incompetence; and flawed, confusing, and insufficient policies and procedures." (OIG Report See Exhibit-A at iv).

## SUMMARY OF ISSUES ARGUED

4.  The BOP Agent's challenged acts viz: decision to classify, designate, and house Valerio in the general population of U.S. Penitentiary. Hazelton, which will inarguably result in his assault is negligence in nature. Further, orchestration of his assault is intentional and malice in nature. None of those challenged acts can be said are 'inherently grounded in consideration of a public policy', which the BOP seeks to accomplish. Unless this Court grants a rehearing en banc, set aside the Panel's decision and recalls the mandate of this Court, the Federal Bureau Of Prison's (BOP) Discretionary Function Exception will completely dislodge the entire Federal Tort Claims Act, offering them free reign to endanger lives of numerous prisoners. A travesty, where the deaths of numerous such prisoners, already have gone unnoticed and unaccounted for. Even if the monetary damages cannot be ORDERED under the FTCA, the Federal Court's have Equitable Jurisdiction, an inherent authority where it could review constitutionality of the "public policy" the agency intends to further. §1331 and §1346 confers such a jurisdiction as well.

## ARGUMENT

## FACTS COMPLETELY OVERLOOKED TO FIT THE THEORY OF DISCRETIONARY FUNCTION

5.  Valerio's classification and designation in general population is unusual considering the nature of his offense, and the historical record of violence against such inmates in U.S.P. Hazelton (Hazelton). In addition, Valerio's immediate placement in the general population at Hazelton, rather than the Secured Housing Unit (SHU), where the BOP may have been able to better protect him from other inmates until the risk he faced at the Hazelton could be assessed, raises a substantial question of negligence.

6.  Whether the BOP agents decision to classify, designate, and house Valerio in general population of a prison that will inarguably result in his assault, is an essential inquiry that neither the lower court, nor the panel's decision attempt to reach. Rather, at both the levels, it is overlooked and entirely failed to consider in making any decisions.

7.  Neither, the lower Court nor the Appellate Panel in making the opinion as it stands today, makes determination as to why at all, Valerio was assaulted. A fact necessary to advance the public policy prong. One cannot affirmatively say, that the Panel considered the fact or overlooked it.

### THE EXECUTIVE BRANCH'S OWN INVESTIGATION REVEALS INCOMPETENCE AND FAILURES AT MULTIPLE LEVELS IN A SIMILARLY SITUATED CASE

8.  The DSCC[1] with the assistance of Senior Intelligence Designators[2], is charged with applying BOP guidelines to select an institute for initial placement and transfers of inmates. The Assistant Director, Correctional Programs Divisions Director, the Regional Director, and the Warden are all involved in actions related to inmates who are designated as Central Inmate Monitoring (CIM) cases. CIM cases include inmates who present "Special needs for Management" and, therefore, "require a higher level of review which may include such as a inmate that need to be separated from other specific inmates for security reasons due to nature and circumstances of their conviction."[3]

9.  The CMC[4] at the receiving institution "assess each inmate's appropriateness for the institute with a 'more local picture,'" because the CMC "know[s] their population better than the Designator and can work with Local SIS[5], Correctional Services, and Unit Team Staff who know the more specialized make up of that institution'"[6].

10. "When the inmate arrives at the receiving institution, the Unit Manager, the Case Manager, Counsellor, SIS Staff, Medical Staff, and Mental Health Staff ... conduct intake screening. If staff at the receiving institution have security concerns about the inmate joining the general population, the inmate may be placed temporarily in the Secured Housing Unit (SHU)[6-1] until a further assessment can be completed regarding the appropriateness of the inmates placement in the general population"[7]. An inmate has no specific role in this process per se.

11. "BOP Officials also ... ha[ve] available means to employ to address safety concerns for inmates .. who are otherwise at risk of violence by other means due to factos such as ... record of sex offenses ..."[8]. According to the SIS Manual, if either the inmate himself or staff perceive that there is a generalized threat against an inmate, SIS will conduct a threat assessment .... [I]f staff determine that the inmate needs protection from specific inmates, SIS will conduct a protective custody determination to assess whether the inmate should be placed in administrative detention or protective custody, such as SHU. The SIS Manual sets out various steps to be taken for threat assessment for protective custody determination[9].

12. The DSCC is charged with, among other things "[e]nsuring placement of inmates in facility commensurate with their security and programming needs", both of which preclude Valerio's classification, designation, and housing him in general population of the Hazelton facility.

13. The specific management and performance failures identified as facts are not the functions shielded by discretionary function exception. They are product of dereliction of duty, utter negligence in Hazelton, where "the guidelines themselves are flawed and lacked clarity"[10].

14. "The steps taken by BOP personnel to assess whether [Valerio] faced harm from other inmates at Hazelton were lacking"[11]. Such challenged acts are not discretionary. "BOP Policies should ensure more meaningful and concerted considerations of security risks when an inmate ... is transferred"[12] or initially placed.

15. Furthermore, negligence and errors are bound to occur in BOP and specifically so in Hazelton, they are inherent "because of staff and management performance failures; bureaucratic incompetence; and flawed, confusing, and insufficient policies and procedures"[13]. This petition to reconsider PRAYS "no BOP inmates transfer [or initial designation], whether they are notorious gangster or a non-violent offender, should be handled like [the one] handled in this instance"[14]. Because, "[t]he facts and circumstances surrounding the BOP's handling of [Valerio's] transfer to Hazelton ... whether or not involved staff with a malicious intent or an improper purpose, it consists of serious job performance and management failures at multiple levels within BOP[15]".

16. It is understandable that the Federal Courts may not violate the powers of the Executive Branch by telling them how to write the policies. Separation of Powers prevents such transgressions. But, once the polices are proclamated by an Agency, it may not short change it. The Court's have jurisdiction to assess those policies, hold them accountable for performance of implimenting the policy. As the executive branch's own investigative agency alluded to, the errors here are not because of discretion, they are because of performance failures. A fact, neither the lower Court, nor the Panel had the benefit of considering in its judgment.

## CONSTITUTIONAL CONSIDERATION OF THE PUBLIC POLICY, BOP SEEKS TO FURTHER

17. A Court reviewing, if the challenged acts are discretionary, "looks to the nature of the challenged decisions in an objective, or general sense, and ask whether those decisions [are] ones which we would expect inherently to be grounded in considerations of policy." Baum V. United States 986 F.2d 716, 720-21 (4th Cir 1993) (emphasis added). The facet of "nature" may not escape review of its constitutionality.

- 5 -

18.  Whether the BOP policy takes into account if the classification, designation, and housing of a prisoner may or may not result in the violation of his constitutional rights is an essential component, that must be evaluated prior to reaching the aspect of furthering a public policy prong. The objective intent for this inquiry is, that a regulatory agency may not create policy that results in violation of constitutional rights of the individuals the policy intends to effect. Such a policy is per se unconstitutional. An unconstitutional policy may not further a public policy, nor a regulatory agency may seek to accomplish it. An essential inquiry that the panel fails to reach. Considering the most vulnerable population in the world the policy intends to effect, the panel's inquiry should have been paramount.

19.  In order to obtain the discretionary function shield, discretionary acts must further a public policy that the particular "regulatory regime seeks to accomplish." Untied States v. Gaubert 499 U.S. 315, 325, n.7 (1991). It is "furthering a public policy" prong that this appellate panel is petitioned to rehear, as well as the aspect of PRAYER for the treatment of en banc hearing or rehearing.

20.  However, it must be noted that Valerio does not bring a facial challenge to the policy's constitutionality. He brings, the challenge "as applied".

21.  It is worth recalling that, the Executive Branch's own watchdog, the Office of Inspector General's investigation alludes to the fact the polices are meaningless. Under the rational basis standard, the constitutionality of BOP's policy must fail as it is vague and overly broad allowing the abuse of the afforded discretion. The policy is arbitrary and irrational.

22.  So long as the BOP implements an unconsitutional policy, United States will continue to remain immune from being sued under the Federal Tort Claims Act. Discretionary function's exception has become a label that is used to cover the multitude of sins. As the Supreme Court has warned in Abbasi that "national security concerns must not become talisman used to ward of inconvenient claims", the Panel's opinion offers the BOP the talismanic and magical wand to ward of every inconvenient claim, no matter how deeply unsettling it is under the constitutional analysis.

23.  The ideal inquiry is, can BOP be allowed to formulate a policy in such a way, that it affords its agents to violate constitutional rights of the prisoners, in the name of discretion, abuse that discretion and then claim a defense under the discretionary function exception. This petition to rehear and treatment of en banc requests, not to adhere to such position.

## CONCLUSION

24. When the lower court made its decision, it did not have the benefit of the report, the Office of Inspector General had compiled, when it undertook the investigation into the homicide of James "Whitey" Bulger, that occured under the similar circumstances, in the same facility as this case charges. The report is a scathing rebuke of the policies, its performance, the incompetence, and negligence of BOP officials. The report does not leave any room for interpretation, what if any, the government calls it "discretionary acts". Even more significantly, the BOP itself accepts the report in full without any modification and agrees to incorporate the recommendations. When the panel made its decision, there is no indication that it had the benefit of the report either.

25. The issues argued here are highly relevant to every prisoner who has suffered injury while in the custody of BOP, due to incompetence and negligence, deliberate or otherwise. In each of those cases, the challenged conduct were erroneously salved under the extremely broad "discretionary function exception". Now the cat is out of the bag, this Court has the opportunity to correct the wrongs of all those individuals who's rights have been eroded. Accordingly, Valerio respectfully requests that this Court GRANT this petition for (a) rehearing of this matter, and (b) hear or rehear this matter en banc.

Respectfully Submitted,

By: Joseph Valerio.

Date Executed :

3·2·23

<u>FOOTNOTES</u>

1.) Designation and Sentence Computation Center. It is located in Grand Prairie, Tx.

2.) Senior Intelligence Directors assist in selecting institutes for inmates with gang and other security risks.

3.) Office of Inspector General Report (Report) at 9.

4.) Case Management Coordinator manages the issues related to criminal cases, programming needs, quarterly reviews, inmate's performance, transfers, etc. at the Unit level in the Facility.

5.) Report at 9.

6.) Id.

6-1) "According to BOP's SHU program statement dated November 23, 2016, a SHU is a housing unit where inmates are securely separated from the general inmate population and the inmate may be placed in the SHU for various reasons, including, disciplinary reasons or for the inmates protections" Report at 10.

7.) Report at 10.

8.) Report at 11.

9.) Report at 12.

10.) Report at III, IV.

11.) Report at III, IV.

12.) Report at IV.

13.) Report at IV.

14.) Report at IV.

15.) Report at 1.





# EXECUTIVE SUMMARY

## Investigation and Review of the Federal Bureau of Prisons' Handling of the Transfer of Inmate James "Whitey" Bulger

### Background and Introduction

On October 30, 2018, at approximately 8:21 a.m., Federal Bureau of Prisons (BOP) staff members found inmate James "Whitey" Bulger unresponsive in his cell at the U.S. Penitentiary (USP) Hazelton, in Bruceton Mills, West Virginia (Hazelton). Bulger was pronounced deceased at approximately 9:04 a.m. the same day. Bulger, who was 89 years old at the time of his death, had visible injuries to his head and face and appeared to be the victim of a homicide.[1] Bulger had been housed at Hazelton for less than 24 hours, having arrived at Hazelton on the night of October 29, 2018, following the BOP's transfer of him from USP Coleman II (Coleman) in Sumterville, Florida.

Bulger gained notoriety for his criminal history as a violent organized crime leader in New England and was on the FBI's list of the 10 Most Wanted Fugitives for over a decade until he was arrested in 2011 and convicted in 2013 of numerous violent crimes that included his role in the murder of 11 individuals. In about September 1975, despite his criminal history and role as a violent organized crime leader, the Federal Bureau of Investigation (FBI) secretly recruited Bulger to be an informant. During his time as an FBI informant, Bulger was responsible for widespread criminal activity, including numerous murders. Additionally, Bulger's FBI handler, Special Agent John Connolly, was corrupt and was subsequently convicted for his complicity in Bulger's crimes. Bulger's leadership of a notorious and violent crime organization, his corrupt association with the FBI, and his status as a most wanted fugitive have received significant media attention. His life story has been the subject of multiple books, television shows, and movies. At least three media representatives requested interviews of Bulger while incarcerated after his 2011 arrest.

Questions regarding Bulger's death gave rise to this Department of Justice (DOJ) Office of the Inspector General (OIG) administrative investigation and review of the facts and circumstances surrounding the BOP's handling of Bulger's transfer from Coleman to Hazelton. First, Bulger's transfer to Hazelton and placement in the general population appeared unusual in view of his age, his health, his notoriety and history as an FBI informant, and the record of violence among inmates at that facility. His violent death less than 12 hours after arriving at Hazelton highlighted these concerns. Second, days before Bulger was transferred to Hazelton, news stories were already reporting his impending transfer. Third, BOP documentation showed that when the BOP transferred Bulger from Coleman to Hazelton they did so based on a determination that he required a lower level of medical care than he was receiving at Coleman, even though he was elderly and continued to suffer from cardiac-related health problems which required medical intervention at Coleman and for which hospitalization was frequently recommended.

---

[1] Consistent with the OIG's ordinary practice, we took care to ensure that our administrative investigation and review did not interfere with the criminal investigation of Bulger's homicide. On August 18, 2022, three individuals, Fotios Geas, Paul J. DeCologero, and Sean McKinnon, all of whom were Hazelton inmates at the time of Bulger's death, were charged in the Northern District of West Virginia with Conspiracy to Commit First Degree Murder in violation of 18 U.S.C. § 371 and related charges in connection with Bulger's death. Geas was also charged with Murder by a Federal Prisoner Serving a Life Sentence in violation of 18 U.S.C. §§ 7(3) and 1118(a).

### Bulger's Medical Condition and Placement in a Special Housing Unit for Nearly Eight Months While Coleman Personnel Sought to Transfer Him to Another BOP Prison

According to BOP records, Bulger developed a heart condition called atrial fibrillation in the summer of 2011 after his arrest. In January 2014, the BOP identified Bulger as a medical care level 3 inmate and housed him at the U.S. Penitentiary (USP) Tucson, in Tucson, Arizona (Tucson), which was a high security facility able to provide inmates with level 3 medical care. The BOP assigns medical care levels to inmates based on a variety of factors, with medical care level 1 corresponding to inmates with the least medical needs and level 4 corresponding to inmates with the greatest medical needs. The BOP then places inmates at institutions commensurate with the level of medical care the inmate requires. On September 3, 2014, the BOP transferred Bulger from Tucson to Coleman, which was also a high security, medical care level 3 institution.

In February 2018, the BOP placed Bulger, who used a wheelchair, in Coleman's Special Housing Unit (SHU), where he was separated from the general inmate population and housed alone in a single cell, after a Disciplinary Hearing Officer determined that Bulger had threatened a BOP nurse at Coleman.[2] This coincided with the beginning of an 8-month effort by Coleman to transfer Bulger to another BOP institution.

The initial Coleman paperwork in April 2018 in support of Bulger's transfer stated that he was being transferred due to safety and disciplinary concerns and requested transfer to another medical care level 3 institution. However, the BOP Southeast Regional Medical Director questioned whether Bulger should be recategorized as a medical care level 2 inmate rather than a level 3 inmate, which would expand the number of prisons where Bulger could be designated, and the request was returned to Coleman for resubmission. Later that same month, Coleman resubmitted its transfer request, again citing safety and disciplinary reasons, but this time sought to transfer Bulger to a medical care level 2 facility. Coleman's request was again denied, this time because Coleman used an incorrect form and sent it to the wrong BOP office. Specifically, Coleman was told that it needed to submit a medical transfer request form rather than a security

transfer form and that it needed to submit the request to the BOP Office of Medical Designations and Transfers (OMDT) rather than the Designation and Sentence Computation Center (DSCC).

In June 2018, Coleman submitted to OMDT the request form seeking to transfer Bulger to a medical care level 2 facility. However, the BOP employee who reviewed the request (OMDT Designator) had concerns about it given Bulger's "complex cardiac history" and his multiple hospital visits. Accordingly, the OMDT Designator sent the request to the BOP Chief of Health Programs (CHP), who was the supervisory physician overseeing OMDT at BOP's Central Office. The CHP determined that Bulger should not be housed at a medical care level 2 but rather at a medical care level 3 or 4 facility, and Coleman was instructed in August 2018 to submit a new medical transfer request.

However, Coleman staff did not follow the CHP's guidance; instead, in September 2018, Coleman submitted another request to transfer Bulger to a medical care level 2 facility. The new request did not reference the CHP's determination that Bulger should be housed in a medical care level 3 or 4 facility. It also did not mention the numerous additional cardiac and other medical incidents that Bulger had since February while housed in the SHU. On October 3, 2018, the BOP Medical Director approved the request to transfer Bulger to a medical care level 2 facility.

The OMDT Designator then selected potential institutions for Bulger's transfer and sought required clearances for those institutions. The OMDT Designator noted a preference for Hazelton based on its geographic proximity to Bulger's family in Boston, its medical care level 2 designation, and the OMDT Designator's assessment, based on her prior interactions with Hazelton, of the quality of medical care Hazelton provided to inmates.

### Bulger's Transfer to Hazelton and His Death About Twelve Hours Later

On October 8, 2018, the BOP approved Bulger's transfer to Hazelton, a high security, medical care level 2 institution. Before Bulger's transfer, well over 100 BOP employees within BOP's Central Office, Mid-Atlantic Regional Office, Southeast Regional Office,

---

[2] According to BOP policy, Special Housing Units (SHU) are "housing units in [BOP] institutions where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates."

Coleman, and Hazelton were notified of Bulgers impending move to Hazelton.

On October 23, 2018, Bulger departed Coleman and was taken to the Oklahoma City Federal Transfer Center (FTC) en route to Hazelton. Between October 25 and October 29, 2018, multiple inmates sent or received emails or made phone calls indicating that they were aware of Bulger's impending arrival at Hazelton. In addition, on October 26, 2018, several media outlets reported that Bulger had been moved to the Oklahoma FTC, citing the BOP website's inmate locator portal as the source of the information. Bulger arrived at Hazelton on October 29, 2018, at approximately 6:00 p.m. The following morning, October 30, 2018, BOP staff found Bulger unresponsive in his cell.

Following his death, the transfer of Bulger pursuant to a medical transfer request stating that he had reduced medical needs raised questions because Bulger was 89 years old, used a wheelchair, and suffered from a heart condition, among other medical problems. The transfer specifically to Hazelton raised additional questions because of the record of violence among inmates at Hazelton, which housed gang members and inmates with connections to organized crime. Based on our review of incident records, Coleman was a safer facility. In addition, questions were raised about Bulger's immediate placement in the general population at Hazelton rather than the SHU, where the BOP may have been able to better protect him from other inmates until the risks he faced at the Hazelton could be assessed. Further, the specific unit in which Bulger was placed at Hazelton housed at least one other inmate with ties, like Bulger, to organized crime in Massachusetts.

## OIG Findings

The OIG's investigation identified serious job performance and management failures at multiple levels within the BOP. For example, we found it deeply troubling that BOP personnel placed an 89-year-old BOP inmate who used a wheelchair and had serious heart conditions for which medical doctors frequently recommended hospitalization and surgery in a single cell in the SHU for 8 months while it was bureaucratically struggling with deciding how to transfer him to a new facility. We similarly found troubling the decision to transfer Bulger to a new facility that provided a lower level of medical care than his prior facility without adequately considering certain

aspects of his medical records, including his repeated cardiac and other medical incidents over the preceding several months. This lengthy SHU placement of Bulger in a single cell before his transfer from Coleman caused him to state in a September 2018 Psychology Services Suicide Risk Assessment that "he had lost the will to live," and may have affected his persistence upon arriving at Hazelton that he wanted to be assigned to general population.

The specific management and performance failures we identified in connection with Bulger's medical transfer included: lack of communication and confusion among BOP personnel regarding the transfer process; BOP medical professionals failing to adequately review Bulger's medical records and failing to take into account Bulger's ongoing cardiac and other medical incidents when making decisions about his medical care level and transfer; BOP officials failing to accurately represent Bulger's medical condition in BOP transfer paperwork; and the BOP not timely updating Bulger's medical care level. We were particularly concerned that the final transfer paperwork submitted by BOP employees was contrary to and did not even acknowledge the clear direction of the BOP's Chief of Health Programs, the supervisory Central Office physician overseeing OMDT, who made a medical determination that Bulger was a medical care level 3 inmate. In addition, we were troubled to find that the decision to lower Bulger's medical care level was actually based on a plausible interpretation of BOP guidelines, and we therefore determined that the guidelines themselves were flawed and lacked clarity.

We also found that, due to BOP's standard procedures, well over 100 BOP officials were made aware in advance of Bulger's impending transfer to Hazelton, and that Hazelton personnel openly spoke about Bulger's upcoming arrival in the presence of Hazelton inmates, which was contrary to BOP policy. The widespread knowledge of Bulger's transfer among BOP officials made it impossible for us to determine the particular BOP employees responsible for these improper disclosures, which resulted in numerous Hazelton inmates being aware of Bulger's transfer to Hazelton days before it occurred. This knowledge among Hazelton inmates subjected Bulger, due to his history, to enhanced risk of imminent harm upon his arrival at Hazelton.

We further found that the steps taken by BOP personnel to assess whether Bulger faced harm from

other inmates at Hazelton were lacking. BOP policy did not require Bulger, based on his inmate profile in BOP databases, to be assessed by a BOP Senior Intelligence Designator—a BOP employee specially trained to conduct intelligence assessments and assess risks by other inmates—prior to his transfer. In addition, several BOP officials told us that they either did not know of Bulger's notoriety or did not consider his identity in making decisions about his transfer. Multiple witnesses told us that they treated Bulger "like any other inmate." While the lack of awareness or consideration of Bulger's identity by BOP officials tends to indicate that these BOP officials did not have improper motivations in connection with Bulger's transfer to Hazelton, we believe BOP policies should ensure more meaningful and concerted consideration of security risks when an inmate of Bulger's notoriety is transferred.

The fact that the serious deficiencies we identified occurred in connection with a high-profile inmate like Bulger was especially concerning given that the BOP would presumably take particular care in handling such a high-profile inmate's case. We found that did not occur here, not because of a malicious intent or failure to comply with BOP policy, but rather because of staff and management performance failures; bureaucratic incompetence; and flawed, confusing, and insufficient policies and procedures. In our view, no BOP inmate's transfer, whether they are a notorious gangster or a non-violent offender, should be handled like Bulger's transfer was handled in this instance.

The OIG has completed its investigation and is providing this report to the BOP to review the performance of the employees as described in this report for any action it deems appropriate. The OIG's investigation did not find evidence of any federal criminal violations. The OIG has shared the results of its investigation with the U.S. Attorney's Office for the Northern District of West Virginia. Unless otherwise noted, the OIG applies the preponderance of the evidence standard in determining whether DOJ personnel have committed misconduct. The U.S. Merit Systems Protection Board applies this same standard when reviewing a federal agency's decision to take adverse action against an employee based on such misconduct. See 5 U.S.C. § 7701(c)(1)(B) and 5 C.F.R. § 1201.56(b)(1)(ii). In addition, we make 11 recommendations for improvements to BOP policies to address the serious concerns we identified during our investigation and review.

iv

# Chapter 1:  Introduction

The Department of Justice (DOJ) Office of the Inspector General (OIG) initiated this investigation and review upon receipt of notification from the Federal Bureau of Prisons (BOP) that on October 30, 2018, at approximately 8:21 a.m., BOP staff members found inmate James "Whitey" Bulger unresponsive in his cell at the U.S. Penitentiary (USP) Hazelton, in Bruceton Mills, West Virginia (Hazelton).  Bulger was pronounced deceased at approximately 9:04 a.m. the same day.  Bulger had visible injuries to his head and face and appeared to be the victim of a homicide.[3]

Bulger was born on September 3, 1929, and was 89 years old when he died.  Bulger gained notoriety for his criminal history as a violent organized crime leader in New England, and was on the FBI's list of the 10 Most Wanted Fugitives for over a decade until he was arrested in 2011 and convicted of numerous crimes in 2013.  Despite his criminal history and continued role as a violent organized crime leader, in about September 1975, the FBI had secretly recruited Bulger to be an informant.  During his time as an FBI informant, Bulger was responsible for widespread criminal activity, including numerous murders.  Additionally, Bulger's FBI handler, Special Agent John Connolly, was corrupt and was subsequently convicted for his complicity in Bulger's crimes.  Bulger, his criminal activity, his corrupt association with the FBI, and his status as a most wanted fugitive have received significant media attention.  His life story has been depicted in multiple books, television shows, and movies.  Indeed, at least three media representatives requested interviews of Bulger while incarcerated after his 2011 arrest.

Bulger's death was suspicious and raised concerns that resulted in this investigation and review.  First, Bulger's transfer to Hazelton appeared unusual in view of his age, his health, his notoriety and history as an FBI informant, and the record of violence among inmates at that facility.  His violent death less than 12 hours after arriving at Hazelton highlighted these concerns.  Second, days before Bulger was transferred to Hazelton, news stories were already reporting his impending transfer.  Third, BOP documentation showed that the BOP transferred Bulger from USP Coleman II (Coleman) in Sumterville, Florida to Hazelton based on a determination that he required a lower level of medical care than he was receiving at Coleman, even though he was elderly and had significant health problems.

The OIG investigated the facts and circumstances surrounding the BOP's handling of Bulger's transfer to Hazelton.[4]  While we did not find that the BOP employees who were involved in his transfer acted with a malicious intent or an improper purpose, we identified serious job performance and management failures at multiples levels within the BOP.  For example, we found it deeply troubling that BOP personnel placed an 89-year-old inmate with serious heart conditions for which medical doctors frequently recommended hospitalization and surgery, and who used a wheelchair, in a single cell in the SHU for 8

---

[3] Consistent with the OIG's ordinary practice, we took care to ensure that our investigation and review did not interfere with the criminal investigation of Bulger's homicide.  On August 18, 2022, three individuals, Fotios Geas, Paul J. DeCologero, and Sean McKinnon, all of whom were Hazelton inmates at the time of Bulger's death, were charged in the Northern District of West Virginia with Conspiracy to Commit First Degree Murder in violation of 18 U.S.C. § 371 and related charges in connection with Bulger's death.  Geas was also charged with Murder by a Federal Prisoner Serving a Life Sentence in violation of 18 U.S.C. §§ 7(3) and 1118(a).  According to the indictment, Geas and DeCologero struck Bulger in the head multiple times while McKinnon served as a lookout.

[4] Separate investigations were conducted by the FBI and BOP Office of Internal Affairs (OIA).  These investigations pertained to the alleged homicide of Bulger as well as any criminal or administrative misconduct by BOP personnel in connection with the homicide.

months while it was bureaucratically struggling with deciding how to transfer him to a new facility, and then decided to transfer him to a new facility that provided a lower level of medical care than his prior facility without adequately considering certain aspects of his medical records, including his repeated cardiac and other medical incidents over the preceding several months.[5] This lengthy SHU placement of Bulger in a single cell before his transfer from Coleman caused him to state in a September 2018 Psychology Services Suicide Risk Assessment that he had lost the will to live, and may have affected his persistence upon arriving at Hazelton that he wanted to be assigned to general population. We also found that, due to BOP's standard procedures, well over 100 BOP officials were made aware in advance of Bulger's impending transfer to Hazelton, and that Hazelton personnel openly spoke about Bulger's upcoming arrival in the presence of Hazelton inmates, which was contrary to BOP policy and resulted in numerous Hazelton inmates being aware of Bulger's transfer to Hazelton days before it occurred. This knowledge among Hazelton inmates subjected Bulger, due to his history, to enhanced risk of imminent harm upon his arrival at Hazelton. Further, we found that minimal efforts to plan for Bulger's arrival at Hazelton from a security perspective enhanced the risk that Bulger would be harmed by other inmates following his transfer.

The OIG has completed its investigation and is providing this report to the BOP to review the performance of the employees as described in this report for any action it deems appropriate. The OIG's investigation did not find evidence of any federal criminal violations. The OIG has shared the results of its investigation with the U.S. Attorney's Office for the Northern District of West Virginia. Unless otherwise noted, the OIG applies the preponderance of the evidence standard in determining whether DOJ personnel have committed misconduct. The U.S. Merit Systems Protection Board applies this same standard when reviewing a federal agency's decision to take adverse action against an employee based on such misconduct. See 5 U.S.C. § 7701(c)(1)(B) and 5 C.F.R. § 1201.56(b)(1)(ii). In addition, we make 11 recommendations for improvements to BOP policies to address the serious concerns we identified during our investigation and review.

Chapter 2 of this report provides background information, including the OIG's methodology for this investigation and review; a description of the BOP offices and key individuals who were involved in Bulger's transfer; and a discussion of applicable law and BOP policies. Chapter 3 provides Bulger's criminal history, correctional history since his 2013 conviction, and medical history. Chapter 4 provides our factual findings related to Bulger's transfer pursuant to a request for a lower medical care level facility, with a focus on the decision by BOP personnel to lower Bulger's medical care level. Chapter 5 provides our factual findings related to the selection of Hazelton for Bulger's transfer and security considerations in connection with Bulger's transfer. Chapter 6 describes the timeline surrounding Bulger's death at Hazelton. Chapter 7 presents the OIG's analysis. In Chapter 8, we provide our conclusions and recommendations. Finally, Appendix A provides a timeline of key events relevant to this investigation and review.

---

[5] Bulger suffered from atrial fibrillation, among other heart problems.

# Chapter 2: Background

In this chapter, we describe the methodology we used during our investigation and review, the BOP offices and personnel that were relevant to our investigation and review, and the applicable legal authority, including federal law and BOP policies, guidelines, and practices.

## I.    Methodology

During the course of this investigation and review, the OIG interviewed more than 30 witnesses, including BOP personnel and inmates, and some witnesses were interviewed multiple times. The BOP personnel interviewed by the OIG included officials in BOP's Central Office and Southeast Regional Office, as well as officials at Hazelton and Coleman. We also collected over 300,000 documents, including Bulger's BOP medical records, BOP records related to Bulger's transfer, BOP policy documents, inmate phone records, staff and inmate emails, financial records, criminal and civil court records, and certain FBI and BOP documents related to their respective investigations of Bulger's death.

## II.    Relevant BOP Offices and Personnel

The BOP consists of a headquarters office in Washington, D.C. (commonly referred to by BOP employees as "Central Office"), 6 regional offices, and 122 BOP-managed facilities throughout the country that house inmates. Each BOP facility falls under the purview of a regional office. Coleman is in the Southeast Region and Hazelton is in the Mid-Atlantic Region. Each regional office has, among other positions, a Regional Director and a Regional Medical Director (who is a medical doctor), and each BOP facility has, among other positions, a Warden, Associate Wardens, Health Services personnel, Special Investigative Services (SIS) personnel, a Case Management Coordinator (CMC), a Deputy CMC, Case Managers, and Correctional Systems Specialists. The Health Services personnel at each institution includes a Clinical Director, who is a medical doctor that oversees the clinical care provided at the institution and supervises the institution's physicians. The BOP informed us that the Clinical Director at each institution reports to an Associate Warden, and neither the Clinical Director nor the individual doctors report to the Regional Medical Director.

There are several divisions within Central Office. The Central Office divisions relevant to this report include the Health Services Division (HSD) and the Correctional Programs Division (CPD), each of which is led by an Assistant Director (AD). The HSD has a Medical Director, who is a medical doctor that supervises the six Regional Medical Directors throughout the country. The HSD also has a Chief of Health Programs (CHP), who also is a medical doctor. During the period relevant to this investigation and review, there was initially one BOP Medical Director and a separate CHP, until the CHP moved to a different position and the BOP Medical Director then served as both the BOP Medical Director and the Acting CHP.[6]

Both CPD and HSD are involved with the placement of inmates in BOP facilities. Under CPD, the Designation and Sentence Computation Center (DSCC) is charged with, among other things, "[e]nsuring placement of inmates in facilities commensurate with their security and program needs." This process is

---

[6] This report references the individuals discussed by the position the individual held during the time period relevant to this investigation and review. Many of these individuals no longer hold these positions, retired, or are otherwise no longer with the BOP.

called "designation" upon sentencing and "redesignation" upon transfer of the inmate. Within HSD, the Office of Medical Designations and Transfers (OMDT) makes designation and redesignation determinations for inmates with medical needs. Both DSCC and OMDT employ Designators, who are charged with applying BOP guidelines to select institutions for the initial placement and transfer of inmates. During the period relevant to this investigation and review, DSCC also employed two Senior Intelligence Designators who assisted in selecting institutions for inmates associated with gangs and for other inmates with enhanced security risks.[7]

The AD of CPD, the Regional Directors, and the Wardens are all involved in actions related to inmates who are designated as Central Inmate Monitoring (CIM) cases. CIM cases are inmates who present "special needs for management" and, therefore, "require a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities." Examples of CIM cases include inmates who have cooperated with law enforcement (Witness Security or WITSEC cases), inmates who have received widespread publicity as a result of their criminal activity or notoriety as public figures (Broad Publicity cases), and inmates that need to be separated from other specific inmates (Separatees) for security reasons (Separation cases). All designations and redesignations of WITSEC cases must be cleared through the Central Office Inmate Monitoring Section (IMS), which is within CPD. Bulger was a CIM case based on Broad Publicity and Separation. In addition, some of his separatees were WITSEC inmates. As a result, he required both CIM and WITSEC clearance before being transferred.

## III.    Applicable Law and BOP Policies, Guidelines, and Practices

This section provides background on the laws and BOP policies, guidelines, and practices that are relevant to this investigation and review.

### A.    Medical Care Guidelines

During the period relevant to this investigation and review, the BOP's 2014 Revised Medical Classification Algorithm and Criteria (2014 Medical Care Level Guidelines) provided guidelines for BOP medical clinicians to determine an inmate's "medical care level" and then match the inmate to a facility with a corresponding medical care level. The 2014 Medical Care Level Guidelines stated the following under the heading "Philosophy":

> Prisons are not always built with access to community medical resources in mind. Many federal prisons are in remote rural locations with limited numbers of specialists and small community hospitals. Inmates have a much higher prevalence of chronic medical and mental health conditions than the general population. The goal of this classification system is to match inmate health care needs (particularly in terms of intensity of care issues, access to community medical resources, and functional criteria) to institutions which can meet those needs. Doing so will result in improved management of these inmates' conditions at a lower overall cost to the agency.

The 2014 Medical Care Level Guidelines contained four medical care levels, with medical care level 1 corresponding to inmates with the least medical needs and level 4 corresponding to inmates with the

---

[7] The BOP has informed us that it now employs three Senior Intelligence Designators.

greatest medical needs. Under the guidelines, certain medical conditions and certain types of interventions required default medical care level classifications, while other conditions and interventions required application of the "Medical Classification Algorithm." Under the 2014 Medical Classification Algorithm, an inmate generally was classified as medical care level 4 if the inmate required daily or nearly daily nursing intervention; medical care level 3 if the inmate required clinical interventions more than once per month; medical care level 2 if the inmate's condition generally could be managed with clinical interventions once every 1 to 6 months (or if the inmate had no chronic medical condition and was over 70 years old); and medical care level 1 if the inmate could be managed with clinical interventions every 6 months or less frequently, provided the inmate was under 70 years old.

The 2014 Medical Care Level Guidelines also contained definitions for types of clinical interventions and how they impact an inmate's medical care level. There were two types of "clinical interventions" defined in the 2014 Medical Care Level Guidelines. The term "Usual Clinical Interventions" was defined as the "[f]requency of chronic care clinic encounters with a physician or midlevel provider required to maintain the inmate in outpatient status, once the inmate's major conditions are stable, Optimal Management has been achieved, and a long-range treatment plan has been established." The guidelines stated that the "frequency of Usual Clinical Interventions is used as one primary criterion for determining care level assignment." The guidelines defined "Intensive Clinical Interventions" as a "period of increased frequency of monitoring and/or treatment for a duration of 3-6 months...for the purpose of achieving clinical indicators of disease management...[or] to stabilize a condition after a clinical event." According to the guidelines, "Periods of intensive clinical intervention are not representative of the inmate's baseline (maintenance) level of clinical intervention, which may be much less frequent. Only the inmate's baseline is to be used to determine a Care Level assignment."

However, according to the guidelines, "Intensive clinical intervention beyond a limited duration will be considered chronic or indefinite, and will warrant reclassification of an inmate's care level." The guidelines provided criteria for inmates to be reclassified to a higher level of care based on the length of time they received particular types of intensive clinical interventions. For example, the guidelines stated that the BOP should reclassify inmates when they received "provider contacts" daily to monthly for greater than 6 months for the same condition or "specialist consults" at least monthly for greater than 3 months in order to maintain outpatient status. The guidelines did not define the terms "provider contacts" and "specialist consults" or provide guidance on how the guidelines on intensive clinical interventions should be reconciled with the Medical Classification Algorithm.

BOP medical staff told us that a number of factors entered into the assessment of an inmate's care level using the 2014 Medical Care Level Guidelines and the 2014 Medical Classification Algorithm. These factors included the inmate's diagnosis, the type of medical treatment the inmate was receiving, the inmate's ability to perform activities of daily living (ADLs), and the overall stability of the inmate's medical conditions. Several BOP medical providers told the OIG that while there are certain conditions and treatments that always require particular care level designations, the Medical Care Level Guidelines and Classification Algorithm also allowed BOP healthcare providers to exercise their clinical judgment.

The 2014 Medical Care Level Guidelines did not address how an inmate's refusal of medical intervention should impact the inmate's medical care level classification. In May 2019, the BOP issued new guidelines called the Care Level Classification for Medical and Mental Health Conditions and Disabilities (2019 Medical Care Level Guidelines). The 2019 Medical Care Level Guidelines state that "Ordinarily, inmate refusal of treatment solely for the purpose of reducing their care level will not result in a reduction of their care level so long as the underlying condition requiring that treatment persists."

**B.    Designations and Redesignation of Inmates to Facilities, Including Medical Designations**

### 1.    General Principles Governing Designation and Redesignation

Federal law concerning the place of imprisonment of federal inmates states:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence.

18 U.S.C. § 3621(b).

The BOP Inmate Security Designation and Custody Classification Program Statement (Designation Program Statement), dated September 12, 2006, and the BOP Medical Designations and Referral Services for Federal Prisoners Program Statement (Medical Designation Program Statement), dated January 15, 2005, provide guidelines for the designation (initial placement) and redesignation (placement upon transfer) of BOP inmates.  The Designation Program Statement states its objectives as follows:

a.    Each inmate will be placed in a facility commensurate with their security and program needs through an objective and consistent system of classification which also allows staff to exercise their professional judgment; and,

b.    Staff will systematically and objectively review an inmate's classification making the environment in which they are housed safer for both inmates and staff while protecting the public from undue risk.

According to the Designation Program Statement, "It is extremely important for Designators to communicate on a regular basis to ensure that designation decisions are consistent."

The Medical Designations Program Statement states its objectives as follows:

a.    Timely and appropriate health care will be given for Federal inmates using Bureau medical, financial, and transportation resources efficiently.

b.    Timely health care will be provided at the most appropriate location....

### 2.    Types of Transfers

There are several types of inmate transfers requiring the redesignation process, and each type of transfer is assigned a code within the Designation Program Statement.  The transfer types that are most relevant to this investigation are "Disciplinary" (Code 309), "Close Supervision" (Code 323), and several types of medical transfers.

A Disciplinary transfer results from "an act(s) of misconduct related to documented poor institutional adjustment," and a Close Supervision transfer results from "an investigation that indicates a safety, security, or escape risk." According to the Designation Program Statement, disciplinary and close supervision transfers typically result in transfer to another institution of "greater security." However, wardens may recommend same security level transfers "when placement at a greater security level institution is not possible or other overriding circumstances exist." The Designation Program Statement states: "Institution staff should carefully review the management of [Disciplinary/Close Supervision] cases on an individual basis, applying sound correctional judgment that considers the safety and security of the inmate, the institution and its staff and the community."

The types of medical transfers include:

- "Transfer for Medical Treatment" (Code 331), which according to the BOP Designation Program Statement is used to transfer an inmate from "general population for the purpose of obtaining medical/physical treatment in a Medical Referral Center" and "[r]equires a change to a CARE 4 assignment," but according to comments from the BOP after reviewing a draft of this report, is "utilized the first time an inmate is transferred from a general population facility to a Care Level Three or Care Level Four facility for increased medical care;"

- "Medical Treatment Completed" (Code 332), which, according to the Designation Program Statement, is used when an inmate returns from a Medical Referral Center to the general population, and, according to BOP employees we interviewed, also is used when an inmate transfers from a medical care level 3 to a medical care level 2 facility;[8]

- "Transfer for Hospitalization and Treatment" (Code 335), which, according to the Designation Program Statement, is used when an inmate retains a level 4 status and transfers between Medical Referral Centers; but according to comments from the BOP after reviewing a draft of this report, is "utilized to transfer inmates that retain the Care Level Three or Four assignment [but] require a transfer from their currently Care Level Three or Four facilities due to clinical or custodial needs;"[9]

- "Decrease in Medical Care Level" (338 Transfer), which is used when an inmate's medical care level decreases from level 3 or 2 to level 2 or 1; and,

---

[8] The Designation Program Statement states that Code 338, "Decrease in Medical Care Level," transfers, discussed two bullets down, are applicable when an inmate transfers from a medical care level 3 to a medical care level 2 facility. However, several witnesses told us that Code 332, "Medical Treatment Complete," was used, at least at the time of Bulger's transfer, for inmates whose medical care level decreased from 3 to 2.

[9] Given the differences between the Designation Program Statement and the BOP's comments, the OIG asked the BOP to provide any additional or revised policies that reflect the information provided in the BOP's comments. The BOP responded that its comments were not based on a newer version of the Designation Program Statement or a different policy but rather that its comments were "intended to provide clarification on the current practical use by OMDT of the identified Transfer Codes."

- "Increase in Medical Care Level" (Code 339), which is used when an inmate's medical care level increases from level 1 or 2 to level 2 or 3.

According to the Designation Program Statement, "Medical redesignations are initiated for inmates with an acute medical, surgical, or psychiatric condition, or for those inmates who have chronic care needs that cannot be addressed at the parent institution," and "[o]nly the OMDT will make designations for...cases requiring medical or psychiatric evaluation or treatment." In addition, the Designation Program Statement states that OMDT "must review all cases in which there is a physical or mental health concern" and that designations and redesignations "will be made by the Central Office Medical Designator" for all inmates who "may need medical or surgical treatment." BOP employees told the OIG that they understood that the Program Statement required BOP staff to use the medical transfer process anytime a medical care level 3 or 4 inmate is being transferred to an equivalent or different medical care level facility, and any time the inmate's care level is assessed to require a change during the transfer process, even if the transfer is for a nonmedical reason such as a disciplinary event. Depending on the care level involved in the request and other circumstances, the relevant Regional Medical Director and the Medical Director or Chief of Health Programs at BOP Central Office may review the transfer request to ensure that the inmate is being transferred at the right medical care level.

### 3.    Completing the Transfer Paperwork

Staff at the referring institution (where the inmate is currently housed) completes the transfer request. Disciplinary and Close Supervision transfer requests must be sent electronically to the DSCC Administrator and contain the following:

(a)    Request for Transfer/Application of Management Variable ["Form 409"] (must be thorough and specific);

(b)    Close Supervision investigation report, if requested; and,

(c)    Intelligence data or supporting memorandum if requested.

The Form 409 includes information regarding, among other things, the inmate's: medical status, institution adjustment, rationale for referral, Central Inmate Monitoring (CIM) information, and any Security Threat Group (STG) associations. The Form 409 is drafted by the inmate's Case Manager and then approved through "normal institutional review channels," including the inmate's Unit Manager and the Warden of the referring institution.

For medical transfer requests, staff at the referring institution completes the Medical/Surgical and Psychiatric Referral Request Form (Form 770) and sends the form to OMDT through the BOP's Bureau Electronic Medical Record (BEMR). During the period relevant to this investigation and review, the process for Treatment Complete transfers was managed using a paper form (Form 413) that was emailed to OMDT for processing.[10] According to the Medical Designation Program Statement, the Clinical Director of the referring institution, with input from other providers involved with the inmate's care, is responsible for

---

[10] According to the BOP, the Treatment Complete process has since been converted to an electronic process through the BEMR.

initiating the Form 770; the Health Services Administrator of the referring institution must review and complete the Form 770; and the Warden of the referring institution must review the Form 770 and authorize the transfer request before it is sent to OMDT.

### 4.    Selecting a Facility

The DSCC and OMDT designators consider various factors in selecting a facility for the inmate's transfer. These factors include security level (explained in next paragraph), custody level (explained in next paragraph), medical care level (discussed in Section III.A. of this chapter); mental health care level; CIM factors, such as Separation or Broad Publicity assignments (discussed in Section III.C. of this chapter); proximity to the inmate's home; institutional programs that the inmate needs; and gang affiliations and related "regional alliances" involving gangs at different institutions (discussed in Section III.C. of this chapter). As noted above, federal law requires that inmates be placed "in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence." 18 U.S.C. § 3621(b). One BOP employee described the process as "like putting a puzzle together."

The institution security levels are minimum (also known as prison camps), low, medium, high, and administrative.[11] Designators use the BOP's "national on-line automated information system," called "SENTRY," to calculate a point score for each inmate "that is matched with a commensurate security level institution." Inmates are assigned a custody level, which determines "the degree of staff supervision required for an individual inmate." The custody levels, in order from least to greatest supervision needs, are "community," "in," "out," and "maximum." Inmate custody levels are determined based on "criminal history and institutional behavior/adjustment," and custody levels are "routinely evaluated and may change for various reasons during the period of incarceration."

### 5.    Communication of Designation and Redesignation Information to the Receiving Institution

Upon making designations and redesignations, DSCC and OMDT Designators must enter information in SENTRY and forward all supporting documents to the designated institution within 2 working days. According to the Designation Program Statement, the CMC at the designated institution is responsible for monitoring the Daily Log of pending inmate arrivals, reviewing documentation related to the new arrivals, and monitoring the timely arrival of newly designated inmates. If the CMC identifies any errors in the designation, the CMC must notify DSCC. According to the Senior Deputy Assistant Director of CPD (Senior DAD), the CMC at the receiving institution reviews the designation documentation and assesses each inmate's appropriateness for the institution with a "more local picture," because the CMC "know[s] their population better" than the Designator and can work with local SIS, correctional services, and unit team staff who "know the more specialized makeup of that institution."

---

[11] An administrative institution is an "institution with a special mission, where inmates are assigned based on factors other than security and/or staff supervision (for example, medical/mental health, pretrial and holdover). Administrative institutions are designed to house all security level inmates."

The Justice Prisoner and Alien Transportation System (JPATS) schedules the movement and transfer of inmates. Before the inmate is transported, the receiving institution receives a "Manifest Report," which identifies the names, register numbers, and destinations of inmates being moved.

When the inmate arrives at the receiving institution, unit managers, case managers, counselors, SIS staff, medical staff, and mental health staff (depending on the inmate's mental health care level) conduct intake screenings. If staff at the receiving institution have security concerns about the inmate joining the general population, the inmate may be placed temporarily in the Special Housing Unit (SHU) until a further assessment can be completed regarding the appropriateness of the inmate's placement in the general population. According to the BOP's Special Housing Unit Program Statement, dated November 23, 2016, a SHU is a housing unit where inmates are securely separated from the general inmate population, and inmates may be placed in the SHU for various reasons, including disciplinary reasons or for the inmate's protection.

### C. Security Issues Related to Transfers of Inmates

#### 1. Central Inmate Monitoring Cases

The BOP uses special procedures for the transfer of CIM cases. CIM cases are inmates who "present special needs for management" and "require a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities."

There are seven CIM categories: Witness Security (WITSEC) Cases, Threats to Government Officials, Broad Publicity, Disruptive Group (DG), State Prisoners, Separation, and Special Supervision. WITSEC Cases include "[i]ndividuals who agree to cooperate with law enforcement, judicial, or correctional authorities." "Broad Publicity" is defined as "[i]nmates who have received widespread publicity as a result of their criminal activity or notoriety as public figures." A DG is "a group, gang, or organization that the Assistant Director, CPD, has formally certified as posing a threat to security that cannot be managed by routine measures." Inmates can receive a DG assignment if they "may require separation from a specific" DG, even if they are not a member of a DG. "Separation" refers to "[i]nmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future." An inmate may be designated as a separatee of another inmate if, among other things, the inmate has provided testimony about the other inmate or the other inmate has exhibited aggressive or intimidating behavior towards the inmate.

Multiple BOP employees told us that transfers of CIM inmates, including Broad Publicity inmates, must be reviewed and approved by both DSCC and a senior official in BOP's Central Office, even if the transfer is being handled as a medical transfer through OMDT. In addition, the Designation Program Statement requires all transfers of WITSEC inmates to be approved through the Central Office Inmate Monitoring Section (IMS). If an inmate is both a WITSEC case and requires medical or mental health treatment, "[IMS] will coordinate with the OMDT regarding an appropriate placement." According to the CIM Policy, the Warden is "the clearance authority on all transfers" of CIM cases except for WITSEC cases, and IMS is "the clearance authority on all transfers" for WITSEC cases. The CIM Policy does not set forth standards or steps that must be taken before the Warden or IMS may exercise their respective clearance authority.

The Designation Program Statement requires BOP staff to notify the Central Office Intelligence Section and the Special Investigative Supervisor at the designated institution before the transfer of an inmate who is a validated member of a DG. The Designation Program Statement does not contain other criteria for referring inmates to the Central Office Intelligence Section before transfer.

In addition, BOP officials told us that at the time of Bulger's transfer, there were two Senior Intelligence Designators within DSCC who were available to assist with designations by conducting intelligence assessments. These officials stated that, while Senior Intelligence Designators were generally available to the DSCC and OMDT designators for consultation, BOP practice at the time of Bulger's transfer required designators to refer inmate-transferees to a Senior Intelligence Designator only if the inmate was a member of a Security Threat Group (STG). The BOP's STG Program Statement, defines an STG as an "inmate group, gang, or organization acting in concert to promote violence, escape, drug, or terrorist activity." The STG Program Statement identifies several "subgroups" of STGs, one of which is DGs. Another type of STG is "Street/Prison Gangs," which refers to "gangs formed either in the community or in prison, including organized street gangs or prison gangs, which may act on behalf of themselves or other highly structured groups." A third STG subgroup is "Security Threat Profile" (STP) which refers to "inmates who possess Advanced or Special Skills or who have been assigned an Individual Threat Profile."

A BOP document entitled "Security Threat Group Roster" lists numerous STG assignments and STP assignments. Examples of STG assignments include leader, member, associate, or drop-out of specified gangs. An example of an STP is "Extensive Media."[12] According to the STG Program Statement, assignment of an STG status in Sentry is "based on Bureau-wide security concerns," and "STG status is advisory in nature, and ordinarily does not require specific actions beyond increased security awareness." BOP officials told us that STG generally refers to large scale national gangs or known prison gangs, such as the Crips, the Bloods, the Aryan Brotherhood, or the Mexican Mafia.

BOP officials told us that after Bulger's death, the BOP hired two additional Senior Intelligence Designators, for a total of four, but later reduced the number of Senior Intelligence Designators on staff to three. In addition, on March 8, 2021, and April 6, 2021, the BOP issued Designation Guidance that addresses the role of Senior Intelligence Designators. However, this guidance still does not contain requirements for consultation with a Senior Intelligence Designator before the transfer of a Broad Publicity inmate that is not identified with a "Member, Drop, or Inactive STG assignment."

BOP officials also told us that it has available means to employ to address safety concerns for inmates who formally disassociate with their former gangs (dropouts) or who are otherwise at risk of violence by other inmates due to factors such as high publicity, prior record of sex offenses, or cooperation with law enforcement.

## 2.    Assessments by Special Investigative Services

The Special Investigative Supervisors Manual (SIS Manual), dated June 2, 2016, provides guidelines for Special Investigative Services (SIS) Supervisors, Special Investigative Agents (SIA), and other BOP staff investigating inmate activities. According to the SIS Manual, "[a]ll institutions must have a functional SIS office," and the Warden "assigns at least one Lieutenant to cover" SIS responsibilities in the institution. The

---

[12] While the Security Threat Group roster includes "Organized Crime" and several specific organized crime groups, such as the Gambino Family, it does not list the Winter Hill Gang, which was the gang that Bulger led in Massachusetts.

SIS is "responsible for 'proactive' efforts to deter or prevent criminal activity," including developing "intelligence regarding inmates or groups of inmates who potentially pose a threat to security or to safety of others." According to the SIS Manual, if either the inmate himself or staff perceive that there is a generalized threat against an inmate, SIS will conduct a threat assessment. If an inmate requests administrative detention or if staff determine that the inmate needs protection from specific inmates, SIS will conduct a protective custody determination to assess whether the inmate should be placed in administrative detention or protective custody, such as the SHU. The SIS Manual sets out various steps to be taken for threat assessments and protective custody determinations, such as reviewing inmate communications and financial activities.

The SIS Manual states that SIS staff "must play a major role in not only investigating violence, drug use, and escape, but in deterring and preventing such acts. To accomplish this, the SIS must know the facility and the population." The SIS Manual further states: "The SIS must continually determine which inmates, inmate groups, or outside groups are engaged in activities that pose a threat to the safety of staff or inmates, the security of the institution or the welfare of the community."

### D.     Safeguarding Information Regarding Transfers of Inmates

The Designation Program Statement prohibits "the release to the general public of an inmate's designation or redesignation information...for security reasons, until the inmate has arrived at the designated facility." The Designation Program Statement provides that the inmate himself "may be advised of his destination but will not be advised of the date or time of transfer." According to the BOP, "caution should be exercised in advising inmates of their destination. The Warden may define cases where the designation will not be disclosed to the inmate." In addition, the BOP Standards of Conduct for employees prohibits and subjects employees to discipline for the unauthorized dissemination of official information and the release of information that could breach the security of an institution.

## CERTIFICATE OF SERVICE

On the _3ʳᵈ_ day of _March_ 20_23_, I the undersigned deposited the foregoing motion(s), affixed with adequate postage prepaid, in the institutes prison mailbox for it to be delivered to the Clerk of Court.

[X] Certified with tracking # :

[ ] A true and correct copy was also mailed to the following address :

Alternatively, when the Clerk dockets the motion(s), all the interested parties who are users of CM/ECF system in this cause of action will be notified by the CM/ECF notification system, satisfying the requirement of service.

I SWEAR, AFFIRM and CERTIFY that the foregoing is true and correct to the best of my knowledge and is provided under the penalty of perjury pursuant to the laws of United States ( See 28 U.S.C. § 1746 ).

Joseph Valerio          (Inmate # _83257-053_ ).

USP TUCSON, P.O.BOX NO: 24550.

TUCSON, AZ 85734.



⇨ 83257-053 ⇨
Joseph M Valerio
[ Inmate No : 83257-053 ]
** United States Penitentiary **
P.O. BOX NO: 24550
Tucson, AZ 85734
United States

7020 2450 0000 6741 1625

MON 06 MAR 2023
WVAZ PDC 850 ZIP

Legal : Clerk Of Court



RECEIVED
U.S. MARSHALS

LeGAL Court

⟺83257-053⟺
Clerk Of Court
U.S. Court OF Appeals
1100 E MAIN ST
Fifth Floor
Richmond, VA 23219
United States

LEGAL ~ Court

75
Violet 75/GG 333
Caplet-shaped
tab

2-3 hours after meal
stomach, 1 hour before or
Take on an empty
unless directed by your doctor
skip doses or discontinue,
Take exactly as directed. Do not
you have questions.
with your doctor or pharmacist if
aggravate your condition. Check
Nonprescription drugs may